UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOHN D. JUSTICE, and on behalf of all
parolees similarly situated,

　　　　　　　　　　　　　　Plaintiffs,

　　　　　　　　　　　　　　　　　　　　　　　　　DECISION & ORDER

v.

　　　　　　　　　　　　　　　　　　　　　　　　　Case # 08-CV-6417-FPG

TERRY KING; SAVING GRACE MINISTRIES,
INC.; EUGENIO RUSSI; KEN WILSON; CHARLES SEARS;
TOM TORTORA; RICHARD MIRAGLIA;
KC SHARMA; BRENDA MARTIN;
DR. ARVIND SAMANT; KIM KARALUS;
DR. JEFFREY GRACE; MICHAEL HOGAN,

　　　　　　　　　　　　　　Defendants.

---

## I.　　INTRODUCTION

　　　This prisoner's civil rights action was commenced on May 9, 2008 by *pro se* Plaintiff

John Justice ("Plaintiff"), an inmate in the custody of the New York State Department of

Corrections and Community Supervision ("DOCCS"), who is currently housed at Great Meadow

Correctional Facility ("Great Meadow"). The Second Amended Complaint[1] ("SAC"), filed on

June 14, 2012, pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985, and 18 U.S.C. § 1964(c), alleges

violations of the First, Eighth, and Fourteenth Amendments of the United States Constitution and

provisions of the Racketeer Influenced and Corrupt Organizations statute ("RICO").[2] ECF No.

---

[1] Though originally named as Defendants in the Complaint filed by Plaintiff on May 9, 2008, Ken Wilson, Charles
Sears, KC Sharma, Brenda Martin, Dr. Arvind Samant, Kim Karalus, and Dr. Jeffrey Grace are not named as
Defendants in the Second Amended Complaint. ECF No. 414. Accordingly, they are dismissed from this action.
Defendant Michael Hogan was named in the SAC, therefore, he is added as a party in this action.

[2] The SAC and RICO Case Statement were filed by Michael F. Orman, Esq., of Nixon Peabody LLP, Plaintiff's
former *pro bono* counsel assigned by Decision and Order dated September 5, 2011. ECF No. 393.

414. A RICO Case Statement was filed pursuant to Rule 9 of Local Rules of Civil Procedure of the Western District of New York (L. R. Civ. P. 9) and Standing Order No. 22. ECF No. 416.

Before the Court for determination are several motions.[3] Plaintiff, *pro se*, filed separate motions denominated as: (1) Notice of Motion for Temporary Restraining Order ("TRO") (ECF No. 440) and Memorandum of Law in Support of Temporary Restraining Order (Pl.'s TRO Mem.) (ECF No. 441); (2) Notice of Cross-Motion for Sanctions and Preclusion Order ("Sanctions") (ECF No. 431); and (3) Notice of Motion for Class Action Certification ("Certify Class") (ECF No. 41).

Six named Defendants have sought dismissal of the SAC pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants Terry King ("King") and Saving Grace Ministries, Inc. ("SGM") have filed a Motion to Dismiss the Second Amended Complaint ("King & SGM MTD"). ECF No. 418. Defendants Michael Hogan ("Hogan"), Richard Miraglia ("Miraglia"), Eugenio Russi ("Russi"), and Thomas Tortora ("Tortora"), collectively referred to as "State Defendants," have filed a Motion to Dismiss the Second Amended Complaint for Failure to State a Claim ("State Defs.' MTD"). ECF No. 426.

Plaintiff, *pro se*,[4] filed Plaintiff's Combined Opposition to Motions to Dismiss (ECF No. 430) and, on his behalf, *pro bono* counsel filed a Memorandum of Law in Opposition to Defendants' Motions to Dismiss ("Pl.'s MOL") (ECF No. 448). Thereafter, in response to *pro bono* counsel's Memorandum of Law in Opposition, Defendants King and SGM, and the State

---

[3] A Notice of Motion seeking to dismiss the Amended Complaint (ECF No. 22), pursuant to Fed. R. Civ. P. 12(b)(6), was filed on behalf of former defendant Hon. Ronald H. Tills on March 3, 2009. ECF No. 67. The CM/ECF Docket Activity Sheet reflects that an Order voluntarily dismissing Hon. Tills from the action without prejudice was entered by United States District Judge Charles J. Siragusa on November 10, 2011. ECF No. 401.

[4] By Decision & Order dated February 21, 2013, this Court issued a Decision & Order granting the motion of Michael F. Orman, Esq. to withdraw as assigned *pro bono* counsel, and assigning Christopher D. Thomas, Esq., of Nixon Peabody LLP, as *pro bono* counsel for the limited purpose of responding to the motions to dismiss. ECF No. 436. The Response was filed in Plaintiff's behalf on July 29, 2013. ECF No. 448.

Defendants filed their respective replies.  ECF Nos. 451, 452.  This is the present posture of the

case.

## II.    FACTUAL BACKGROUND

### A.  State Court Trial and Appellate History

Summarized in a decision by the New York State Supreme Court, Appellate Division,

Fourth Department (Green, Justice), are the initial background facts in this case:

> The facts of this tragic case are not in dispute and may be stated
> briefly.   On September 16, 1985 at approximately 3:15 P.M.
> defendant, then 17 years of age and academically gifted, stabbed
> his brother to death as the brother returned home from school.
> Shortly thereafter, defendant fatally stabbed his mother when she
> returned home from work, then picked up his father from work in
> the family car and stabbed him to death as he entered the house.
> Defendant then made several unsuccessful attempts at suicide, left
> the house in the family car at approximately 7:15 P.M., drove the
> car at an excessive rate of speed and crashed into a car operated by
> Wayne Haun, who was killed.   Defendant sustained only minor
> injuries.
>
> Defendant was charged with four counts of murder in the second
> degree and four counts of criminal possession of a weapon in the
> fourth degree for the stabbing deaths of his brother, mother and
> father and the death of Mr. Haun.   At trial defendant asserted the
> affirmative defense of insanity (*see*, Penal Law § 40.15).   The jury
> found that defendant established the affirmative defense with
> respect to the deaths of his father and brother and found defendant
> not guilty by reason of mental disease or defect on those counts.
> The jury found defendant guilty of intentional murder in the death
> of his mother and guilty of depraved indifference murder in the
> death of Mr. Haun.

*People v. Justice*, 173 A.D. 2d 144, 145-46 (N.Y. App. Div. 1991).  Following these verdicts,

Defendant was sentenced in Erie County Court on February 20, 1987 to a term of 25 years to life

on each of the murder counts and a term of one year on each of the weapons possession charges,

all sentences to be served concurrently.  Erie County Court ordered these sentences to be served

first  and  that  compliance  with  these  sentences  was  to  satisfy  the  statutorily  required

commitments as a result of having been found not guilty by reason of mental disease or defect in the deaths of his brother and father.

On appeal, the Fourth Department did not disturb the not guilty by reason of mental disease or defect dispositions, but reversed the murder convictions and the related weapon possession counts, on the ground that the trial court failed to properly respond to a jury request for supplemental instruction on the insanity defense, and remanded for a new trial. *Id.* at 148-49. Following a retrial, at which he was convicted of manslaughter in the first degree in the death of his mother and manslaughter in the second degree in the death of Mr. Haun, and the related weapon possession counts and, thereafter, on January 14, 1993 sentenced to consecutive terms of 8⅓ to 25 years, and five to 15 years, an aggregate term of 13⅓ to 40 years, on the manslaughter convictions, and one year on each of the weapon possession convictions, Plaintiff again appealed.  The judgment was unanimously affirmed.  *People v. Justice*, 202 A.D. 2d 981 (N.Y. App. Div. 1994).

### B.  Plaintiff's Second Amended Complaint

Plaintiff has sued all Defendants in their individual and official capacities, and the SAC describes the Defendant parties to this action as follows: SGM—a corporation organized under New York Law with its principal place of business at 1932 Bailey Avenue, Buffalo, New York and "formed for the purposes of, inter alia, 'promot[ing] and engag[ing] in efforts … to influence youth and others to follow the principles of the gospel of Jesus Christ'"; King—an individual with a principal place of business at 1932 Bailey Avenue, Buffalo, New York, a founder of SGM and its Executive Director at all relevant times; Russi—an individual with a principal place of business at 460 Main Street, Buffalo, New York, an employee of the New York State Division of Parole ("DOP"), and upon information and belief, current DOP Regional Director; Tortora—an individual with a principal place of business at 454 E. Broad Street, Rochester, New York, an

employee of the DOP, and upon information and belief, current DOP Program Specialist; Miraglia—an individual with a place of business at 100 Park Street, Glens Falls, New York, an employee of the New York State Office of Mental Health ("OMH"), including at relevant periods, Associate Commissioner; and Hogan—an individual with a place of business at 44 Holland Avenue, Albany, New York, current Commissioner of OMH ("Comm. OMH").  ECF No. 414, ¶¶ 3-9.

The SAC recounts the trial and appellate history related above (ECF No. 414, ¶¶ 11-14, 18), advancing several claims in five separate counts, the first three pursuant to 42 U.S.C. § 1983 and the last two pursuant to RICO, 18 U.S.C. § 1961, *et seq*.  Count I alleges that Defendants Miraglia and Hogan deprived him of liberty without due process in violation of the Due Process Clause of the Fourteenth Amendment by subjecting him to New York Criminal Procedure Law § 330.20 ("CPL § 330.20"); violated his rights under the Equal Protection Clause of the Fourteenth Amendment by treating him differently than other persons who have satisfied statutory commitment requirements under CPL § 330.20 and intentionally discriminated against him; and violated his right to substantive due process under the Fourteenth Amendment by subjecting him to CPL § 330.20.  ECF No. 414, ¶¶ 33-39.

Count II alleges a putative class of "all parolees who have resided at properties owned or operated by Defendant SGM" and that Defendants SGM, King, and Russi violated Plaintiff's individual and (putative) class members' rights under the Establishment Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment by coercing them to accept placement at SGM residences and to participate in Evangelical Christian and Start Teaching About Relationship Truths ("S.T.A.R.T.") Program activities, while in placement.  ECF No. 414, ¶¶ 40-47.  Count III alleges that Defendants SGM, King, Miraglia, Hogan, and

Russi violated his rights under the Eighth and Fourteenth Amendments by their deliberate indifference to his mental health needs.  ECF No. 414, ¶¶ 48-50.

Counts IV and V allege RICO violations.  On behalf of Plaintiff individually and the members of the (putative) class of "all parolees who have resided at properties owned or operated by SGM," Count IV alleges that Defendants King and Tortora violated RICO, 18 U.S.C. § 1962(c) by establishing an enterprise.  ECF No. 414, ¶¶ 51-71.  On behalf of Plaintiff individually and (putative) class members, Count V alleges that Defendants SGM, King, and Tortora violated RICO, 18 U.S.C. § 1962(b) by acquiring an interest or control of the enterprise through a pattern of racketeering activity.  ECF No. 414, ¶¶ 72-74.  Plaintiff's RICO Case Statement basically tracks these allegations.

## III.   DISCUSSION

**A.**  Before proceeding to discuss the Defendants' motions to dismiss the SAC, I will address, in turn, *pro se* Plaintiff's other motions.

### 1.  TRO

*Pro se* Plaintiff states that he is the subject of a Criminal Procedure Law § 330.20(14) Recommitment Application filed against him in Erie County on behalf of Defendant Hogan, and by this motion seeks a temporary restraining order pursuant to Fed. R. Civ. P. 65(b), "directed at Defendant Michael Hogan to temporarily prevent the CPL 330.20(14) Recommitment Application from proceeding in State Court."  ECF Nos. 440.  As support for this TRO application, Plaintiff has attached to his Affidavit several exhibits, including copies of the current pleading in this action, Ex. A (ECF No. 440-1); the CPL § 330.20(14) Recommitment Application made on behalf of Defendant Hogan on February 14, 2013, Ex. B (ECF No. 440-2); the transcript of the deposition of Defendant Miraglia conducted on January 19, 2012, Ex. C (ECF No. 440-3); Defendant Miraglia's Response to Plaintiff's First Request for Admission, Ex.

6

D (ECF No. 440-4); the Memorandum Decision and Order of M. William Boller, A.J.S.C., dated January 23, 2008, which denied Petitioner Justice's C.P.L.R. Article 78 application to compel Respondents Hogan and the Erie County District Attorney to apply for a recommitment order pursuant to CPL § 330.20(14) and disclosure pursuant to CPLR Article 31, Ex. E (ECF No. 440-5); and a proposed Temporary Restraining Order, EX. F (ECF No. 440-6).  For the reasons set forth herein below, Plaintiff's application for a TRO is denied.

The well-settled test for granting a temporary restraining order, in the Second Circuit, is the same as for a preliminary injunction (*see Jackson v. Johnson*, 962 F. Supp 391, 392 (S.D.N.Y. 1997)),  and requires the movant to demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary injunctive relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (per curiam).   As Plaintiff points out, the violation of a constitutional right will demonstrate irreparable harm. *Lynch v. City of New York*, 589 F.3d 94, 99 (2d Cir. 2009).

It is also well settled, generally, that the decision to grant injunctive relief falls within the sound discretion of the district court. *Himes v. Sullivan*, 779 F. Supp. 258, 272 (W.D.N.Y. September 4, 1991) (citing *Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 758 (2d Cir. 1979)) (citing *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931–32 (1975)).  A court is reminded that a temporary restraining order "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citations omitted), since its purpose is to "preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the merits." *Candelaria v. Baker*, No. 00-CV-0912E, 2006 U.S. Dist. LEXIS 13238, at *9,

2006 WL 618576, at *3 (W.D.N.Y. Mar. 08, 2006) (quoting *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (per curiam)).

Plaintiff contends that a TRO is needed to prevent irreparable harm based on "the threat of an unlawful civil commitment [in] violation of due process under CPL 430.10 and the 14th Amendment," and of "Eighth Amendment rights to be free from cruel and unusual punishment," based on the following allegations that: Hogan has used an illegally obtained CPL § 330.20(12) Order of Conditions to deprive him of liberty and is seeking by the Recommitment Application to unlawfully deprive him of liberty; the Physician's Affidavit of Dr. Brian Belfi, submitted as support for the Recommitment Application alleges that Plaintiff is dangerously mentally ill, a condition which cannot be justified solely on the basis of a personality disorder; and, under CPL § 430.10, once commenced, a criminal sentence cannot be interrupted, but if a Recommitment Application is granted, Plaintiff would be removed from the custody of DOCCS to Hogan's custody under CPL § 330.20, interrupting his sentence in violation of CPL§ 430.10 and the Fourteenth Amendment, and causing him to lose credit for time served toward his criminal sentence; and his criminal sentence did not contemplate a period of CPL § 330.20 supervision. ECF No. 441, ¶¶ 9-25.

Regarding the likelihood of success on the merits, Plaintiff primarily relies on the Second Amended Complaint filed in the 42 U.S.C. § 1983 action discussed herein-above, specifically the allegations regarding an Order of Conditions granted by Supreme Court, Erie County (Justice Ronald H. Tills) on January 3, 2006, and the granting of a five-year extension of the Order of Conditions by the Supreme Court, Erie County, on February 23, 2011.  ECF No. 414, ¶¶ 24, 30. Significantly, Plaintiff alleges in the instant TRO motion that the illegally obtained Order of Conditions underlies the Recommitment Application which threatens "unlawful civil commitment," resulting in a loss of liberty in violation of the Fourteenth Amendment.

Additionally, Plaintiff seeks a stay of the state court proceedings.  He further argues that regarding comity, the *Rooker-Feldman* doctrine does not apply to parallel state and federal proceedings.

With respect to staying proceedings in state court, the court in *Gustave v. City of New York*, No. 10-CV-3314 (KAM), 2010 WL 3943428, at *2 (E.D.N.Y. Oct. 6, 2010) discussed the relevant law:

> The law is clear that as a general rule, federal courts may not enjoin state court proceedings.  *See* 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."); *Younger v. Harris*, 401 U.S. 37, 45 (1971) ("[T]he normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions.").  Federal courts may enjoin state criminal proceedings only "under extraordinary circumstances, where the danger of irreparable loss is both great and immediate." *Younger*, 401 U.S. at 45 (quoting *Fenner v. Boykin,* 271 U.S. 240, 243, 46 S.Ct. 492, 70 L.Ed. 927 (1926)).  "Certain types of injury, in particular, the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution, could not by themselves be considered 'irreparable' in the special legal sense of that term." *Id.* at 46.   Thus, where the injury to the accused is "solely that incidental to every criminal proceeding brought lawfully and in good faith, ... he is not entitled to equitable relief," even where the statute under which he is prosecuted is to be claimed unconstitutional.   *Id.* at 49 (internal quotation and citations omitted).  A challenge to a state prosecution as "unauthorized and hence unlawful" will not, without more, warrant federal intervention. *Id.* at 46 (quoting *Watson v. Buck,* 313 U.S. 387, 400, 61 S.Ct. 962, 85 L.Ed. 1416 (1941)).

The general rule is applicable in the instant matter, as Plaintiff has presented no basis for concluding that a stay pursuant to 28 U.S.C. § 2283 is warranted, or that "extraordinary circumstances, where the danger of irreparable loss is both great and immediate" exist.  Federal intervention is unwarranted where the gravamen of Plaintiff's claim is that the alleged loss of

liberty will result from unauthorized and unlawful recommitment proceedings in state court which is based upon an illegally obtained Order of Conditions.

Contrary to Plaintiff's urging, the *Rooker-Feldman* doctrine does apply in the circumstances presented. A plaintiff may not initiate an action in federal court that: (1) directly challenges a state court holding or decision; or (2) indirectly challenges a state court holding or decision by raising claims in federal court that are inextricably intertwined with the state court judgment, even if the main claim is that the state court's action was unconstitutional. *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 466 (1983). Only the Supreme Court may entertain a direct appeal from a state court judgment. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). By this TRO application, Plaintiff is seeking to have this court engage in the very conduct proscribed by the *Rooker-Feldman* doctrine. Moreover, the state court proceeding seeking recommitment pursuant to CPL § 330.20(14) is not, as Plaintiff contends, a parallel criminal proceeding to the instant § 1983 action. This court, therefore, is constrained not to interfere in the state court proceedings.

Finally, I am also aware that during this federal court action, Plaintiff previously, unsuccessfully attempted in the Western District Court of New York to enjoin state court proceedings begun in December 2010 when the New York State Attorney General's Office sought an order extending the same Order of Conditions of release pursuant to CPL § 330.20. By Decision and Order dated January 27, 2011, United States District Judge Charles Siragusa denied Plaintiff's motion for substantially the same reasons. ECF No. 319. Based upon the law and for the afore-stated reasons, the application for a TRO is denied.

## 2. Class Certification

In the original Complaint commencing this action on May 9, 2008, Plaintiff, *pro se*, alleged a class action in Counts III, IV, and VI. ECF No. 1. On July 10, 2008, Plaintiff filed a

notice of motion ("Notice of Motion for Extension of Time, Pursuant to Rule 23(d) of the Local Rules of Civil Procedure") and supporting affidavit seeking to extend the time to move for class action status. ECF No. 7. Thereafter, on November 20, 2008, Plaintiff filed a motion seeking to certify as class actions Counts III, IV, and VI of the Amended Complaint ("Notice of Motion for Class Action Certification") (ECF No. 41).

Pursuant to the Motion Scheduling Order of December 8, 2009 (ECF No. 50), all served Defendants filed responses in opposition to the motion (ECF Nos. 55, 56), and requested denial of the motion on several grounds. First, all Defendants alleged that the motion was untimely pursuant to Local Rule of Civil Procedure 23(d) which required motion filing "within 120 days after the filing of a complaint alleging a class action, unless this period is extended in the scheduling order, or on motion for good cause filed prior to the expiration of the 120-day period, the party seeking class certification shall move for a determination under Federal Rule of Civil Procedure 23(c)(1) as to whether the case is to be maintained as a class action." Second, all Defendants alleged that class action certification was not appropriate in the circumstances of Plaintiff's case. Plaintiff filed his replies to Defendants' responses. ECF No. 58, 59, 60. He has since filed the SAC (ECF No. 414), setting forth allegations respecting the putative class members in connection with Counts III, IV and V, repeating the previous allegations:

> The class for purposes of this Count consists of all parolees who have resided at properties owned or operated by Defendant SGM. Upon information and belief, the number of class members exceeds 1000 and joinder of all members is impracticable. There are questions of law and fact common to the class and Plaintiff's claims in this Count are typical of, and identical to, those of all class members. Plaintiff is committed to pursuing the class members' claims, and will fairly and adequately represent the class.

With respect to the timeliness issue, upon review, the docket activity in this case reveals that no scheduling order for good cause shown was ever entered granting the July 2008 request

for an extension, and none was sought by Plaintiff within the specified time frame.  The motion,

therefore, was untimely.

Even if I were to ignore the lack of timeliness, which I do not so choose, consideration of

the merits leads me to conclude that the motion to certify the class should be denied based on the

failure to comply with the standards for class certification set forth in Rule 23 of the Federal

Rules of Civil Procedure.   In Rule 23(a), the four prerequisites, numerosity, commonality,

typicality, and adequacy are delineated, respectively:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Not only must these four prerequisites be met, but certification of the class must be

deemed appropriate under one of the three subdivisions of Rule 23(b):

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>> A. inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>> B. adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

A. the class members' interests in individually controlling the prosecution or defense of separate actions;
B. the extent and nature of any litigation concerning the controversy already begun by or against class members;
C. the desirability of concentrating the litigation of the claims in the particular forum; and
D. the likely difficulties in managing a class action.

In denying class certification, the Court need look no further than Plaintiff's failure to do little more than offer speculation about the numerosity of the purported class of parolees. Notably, in his extension request, Plaintiff pointed only to two individuals, parolees housed at SGM halfway houses, whom he alleged would be members of the putative class, one named and one unnamed, and that he would enumerate others, once his Freedom of Information Law ("FOIL") request was granted. He attached a "purported" affidavit from the named individual.

Indeed, it appears that, ultimately, Plaintiff was unsuccessful in his quest to use FOIL to obtain SGM records in order to substantiate his claims regarding the existence of a 1000-parolee putative class. In *Justice v. King*, 60 A.D. 3d 1452 (N.Y. App. Div. 2009), the Appellate Division, Fourth Department reversed a lower court's determination in Plaintiff's favor, and denied Plaintiff's FOIL request on the basis that SGM was a nongovernmental, private entity that was not subject to N.Y. Public Officers Law § 86(3) (McKinney). There is no other evidence in the record from which to remotely suggest that such a class exists.

Furthermore, I agree with Defendants' view that Plaintiff's circumstances are genuinely unique to him, precluding compliance with Rule 23 requirements. Class action certification is not appropriate in the circumstances of Plaintiff's case. The motion to certify the class as described by Plaintiff is denied.

### 3. Sanctions and Preclusion

Following the filing of Defendants' motions to dismiss (ECF No. 418, 426), Plaintiff, *pro se*, filed a Notice of Cross-Motion for Sanctions and Preclusion Order against all Defendants.

ECF No. 431. Therein, he alleged that the dismissal motion brought by Defendants King and SGM "rely [sic] on facts outside the scope of a Rule 12(b)(6) motion," namely, Exhibit 1 consisting of excerpts of Plaintiff's parole revocation hearing, and Exhibit 2, consisting of the Draft Audit Report, both of which are attached to the Declaration of their attorney James D. Donathen, Esq. and were "illegally withheld" from Plaintiff as demonstrated by emails exchanged between his former *pro bono* counsel, Michael F. Orman, Esq., and defense counsel (ECF No. 431, Ex. A); and, further, to the extent that the State Defendants, in their motion to dismiss, have relied on these exhibits, "they are liable to the same extent as King and SGM." ECF No. 436, ¶¶ 1-13.   Plaintiff sought entry of an order of preclusion "to prevent the Defendants from offering such evidence *until adequate Rule 30(b)(6) deposition testimony be taken*" (emphasis added), and for sanctions against all Defendants for frivolous conduct.

The motion is denied.  In any event, herein below, the Court will address these same two documents, as part of Plaintiff's separate request related to Defendants' motions to dismiss the SAC.

### B. Legal Standards Governing a Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6)[5]

A court deciding a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, "must accept as true all of the allegations contained in a complaint." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  "(T)he duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010).

---

[5] The Court previously herein denied Plaintiff's motion for class certification in this action.  Consequently, the Court makes no reference to putative class members in determining Defendants' motions for dismissal.

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The determination regarding "whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Under this plausibility standard, a complaint must allege "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.

"[W]ell-pleaded factual allegations" permit a court to "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. Although Plaintiff's factual allegations set forth in the Complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," therefore, pleadings that "are no more than conclusions ... are not entitled to the assumption of truth." *Id.* 678, 679. If a plaintiff "ha[s] not nudged [his/her] claims across the line from conceivable to plausible, [his/her] complaint must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Additionally, in adjudicating a motion to dismiss, a court is entitled to consider only the facts alleged in the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, any documents integral to the complaint and relied on in it, and facts of which judicial notice may properly be taken under Fed. R. Civ. P. 201. *See In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013); *see Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). As a preliminary matter, Plaintiff's *pro bono* counsel, in his

memorandum response in opposition to King and SGM's dismissal motion, has asked this Court

to disregard, as extrinsic materials, certain documents offered to support their motion to dismiss,

consisting of: (1) portions of the King deposition dated May 16, 2007 and (2) a Draft Audit

Report of SGM's reimbursement requests dated August 26, 2009 because they were not

referenced or relied on in the SAC.   In their supporting memorandum, Defendants King and

SGM argue that the Draft Audit Report covering the period between May 1, 2007 and April 30,

2009 found no over-reimbursements and King discussed reasons leading up to contacting DOP

regarding Plaintiff's threats to harm or kill Grace House staff.  ECF No. 424.

Review of the SAC reveals, and the Court notes, that these two documents were not

among those attached to the SAC and/or specifically referenced therein.  The SAC attachments

consist of: Exhibit A—Previous Lawsuits in State and Federal Court Involving Facts in this

Action (ECF No. 414-1); Exhibit B, Part 1 and 2—a manual for the "S.T.A.R.T. Program" which

he alleges is one of the Christian Evangelical activities and programs at Grace House while he

was a resident (ECF Nos. 414-2, 414-3); and Exhibit C—Residential Stabilization Program

Scope of Services (ECF No. 414-4) which he alleges is a copy of a portion of one of the

contracts between Defendant SGM and DOP.

Rule 12(d) addresses the presentation of matters outside the pleadings and specifies a

notice requirement:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the
> pleadings are presented to and not excluded by the court, the
> motion must be treated as one for summary judgment under Rule
> 56, all parties must be given a reasonable opportunity to present all
> the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d); *Sira v. Morton*, 380 F.3d 57 (2d Cir. 2004) ("A district court must convert

a motion for judgment on the pleadings to one for summary judgment if the motion includes

'material outside the pleadings' and that material is 'not excluded by the court.'").

Because these two documents were not attached to the SAC, incorporated therein by reference, or so heavily relied upon as to render them integral to the SAC, the Court excludes them from consideration for purposes of deciding the motions to dismiss. Defendants' motions to dismiss will not be converted to motions for summary judgment.

## C. Motions to Dismiss the RICO Claims in Counts IV and V

### 1. RICO Claim Elements

RICO provides a private cause of action for treble damages to "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). Section 1962 specifies the prohibited criminal activities. 18 U.S.C. § 1962(a)-(d).[6] Plaintiff alleges, in Count IV, violations of § 1962(c) and, in Count V, violations of § 1962(b), which sections provide, respectively, as follows:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). [7]

> It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(b).[8]

---

[6] Plaintiff has not alleged a RICO civil conspiracy in violation of 18 U.S.C. 1962(d) which provides: "It shall be unlawful for any person to conspire to violate the provisions of the subdivisions (a), (b), or (c) of this section."

[7] To state a claim under § 1962(c), the plaintiff must allege that: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *DeFalco v. Bernas*, F.3d 286, 306 (2d Cir. 2001).

[8] To state a claim under § 1962(b), the plaintiff must allege that: (1) the defendants engaged in a pattern of racketeering activity for the purposes of acquiring an interest in or maintaining control of the enterprise; (2) the defendant in fact acquired an interest in or maintained control of the enterprise through a pattern of racketeering activity; and (3) the plaintiff suffered an injury as a result of the acquisition or control, separate and apart from any injuries attributable to the individual acts of racketeering. (Citing *DeFazio v. Wallis*, 500 F. Supp. 2d 197, 208-09 (E.D.N.Y. 2007)).

In order for a plaintiff to state a claim for damages under RICO, he or she has two distinct pleading burdens.   First, plaintiff must allege the violation of "criminal RICO," 18 U.S.C. § 1962.   *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983).

> In so doing, [a plaintiff] must allege the existence of seven constituent elements:   (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.

*Id.* (citing 18 U.S.C. § 1962(a)-(c)) (citations omitted).   Once the plaintiff has sufficiently alleged a § 1962 violation, the plaintiff must satisfy the second burden, by alleging that he was "injured in his business or property by reason of a violation of § 1962."   *Id.* (quoting 18 U.S.C. § 1964(c)).

Section 1961 defines the relevant statutory terms: a "'person' includes any individual or entity capable of holding a legal or beneficial interest in property" (18 U.S.C. § 1961(3)); an "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity" (18 U.S.C. § 1961(4)); a "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity" (18 U.S.C. § 1961(5)); and "[r]acketeering activity" means, inter alia, "any act which is indictable under ... section 1341 (relating to mail fraud)." 18 U.S.C. § 1961(1)(B).

## 2.   Fraud Allegations Under Fed. R. Civ. P. Rule 9(b)

Plaintiff has alleged mail fraud as the basis of Defendants' predicate act of racketeering. Mail fraud occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice or

attempting to do so." 18 U.S.C. § 1341. "The gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element,' … even if the mailing itself 'contain[s] no false information.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) (quoting *Schmuck v. United States,* 489 U.S. 705, 712, 715 (1989)) (citation and internal quotation marks omitted). "It is well settled that to constitute mail fraud the defendant (1) must participate in the scheme to defraud; knowingly use the mails to further that scheme; and must have the specific intent to defraud." *Giuliano v. Everything Yogurt, Inc.*, 819 F. Supp 240, 245 (E.D.N.Y. 1993) (citing *United States v. Rodolitz*, 786 F.2d 77, 80 (2d Cir.), *cert. denied* 479 U.S. 826 (1986).

Complaints alleging mail fraud, as defined in 18 U.S.C. § 1341 (18 U.S.C. § 1961(1)(B)), must comply with the heightened pleading standard for fraud claims imposed by Rule 9(b) of the Federal Rules of Civil Procedure, which provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.   Malice, intent, knowledge, and other conditions of a person's mind may be averred generally." Fed. R. Civ. P. 9(b).

To comply with the Rule 9(b) particularity requirement, a plaintiff must generally state the time, place, speaker, and content of the alleged misrepresentation. *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).   In other words, the "complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas v. Hassett*, 886 F. 2d 8, 11 (2d Cir. 1989).   Here, the SAC satisfies this heightened pleading standard.   It thoroughly details the various mailings allegedly made by these Defendants, stating the time, place, speaker, and content of the alleged misrepresentations.

Under Rule 9(b), intent may be generally averred.  However, "a complaint must nonetheless allege facts which give rise to a strong inference" of the defendant's fraudulent intent.  *Id.*  With respect to these Defendants, the SAC satisfies this Rule 9(b) pleading requirement as well.

It is understood that the mail fraud statute does not require that a defendant personally mail a letter, but plaintiff must allege "1) that the defendant caused the mailing and 2) that the mailing was for the purpose of executing the scheme or incidental to an essential part of the scheme." *Ifill v. West*, No. 96 CV 6308(SJ), 1999 WL 690144, at *6 (E.D.N.Y. Aug. 24, 1999) (internal quotations and citations omitted).

### 3. RICO Illegal Activities

The SAC alleges that SGM, referred to as "the Enterprise," is an enterprise within the meaning of 18 U.S.C. § 1961 (4); that the Enterprise has a corporate structure, and upon information and belief, was established in 1999 to carry out the illegal activities alleged; and King is employed by the Enterprise as its Executive Director.  ECF No. 414, ¶¶ 56-57.  As a result, Plaintiff alleges, these illegal activities, directly and proximately caused irreparable harm and injury to his property because (1) they enabled the Enterprise's existence and perpetuation, (2) while in the Enterprise's custody and control, Plaintiff did not receive the level of services he would have received in legally operated transitional housing, and (3) he was required to pay public assistance benefits to the Enterprise for substandard services. *Id.* ¶ 58.

The SAC goes on to allege four specific types of mail fraud constituting the pattern of racketeering activity as defined in 18 USC § 1961(1)(B).  ECF No. 414, ¶¶ 59-64.  First, it alleges that King, acting with a specific intent to deceive, committed mail fraud in September 1999 by mailing a Certificate of Incorporation for SGM to the New York Department of State falsely stating the mission of SGM and fraudulently omitted its true purpose. *Id.* ¶ 59.  Second,

it alleges that King, acting with a specific intent to deceive, committed mail fraud by mailing three separate "Standard Vendor Responsibility Questionnaire[s]," respectively in July 2005, September 2005, and January 2007, to DOP in which he falsely swore that he had not been the subject of an unsatisfied judgment within the past five (5) years. *Id.* ¶¶ 60-62.  Third, it alleges that King, acting with a specific intent to deceive, on numerous occasions, including, in June 2007, August 2007, February 2008, and July 2008, committed mail fraud by sending "Standard Vouchers" to DOP knowing that such vouchers requested reimbursement for services for which he also sought reimbursement under other vouchers, including with respect to utility and personnel costs. *Id.* ¶ 63.  Fourth, it alleges that King, acting with a specific intent to deceive, on numerous occasions, including in December 2005, February 2006, July 2007, and December 2007, committed mail fraud by sending "Standard Vouchers" to DOP knowing that such vouchers sought reimbursement for services that had not been provided or expenses that had not been incurred; upon information and belief, these vouchers sought reimbursement for bus pass expenditures that were not incurred.  *Id.*  ¶ 64.

The SAC alleges that Tortora is associated with the Enterprise as Contract Manager for contracts between the DOP and SGM; had access to SGM's books and records; endorsed and approved most of the aforementioned vouchers; and upon information and belief, did so with specific intent to deceive and with knowledge that the vouchers did not reflect actual expenditures and/or were duplicative of payments for services reimbursed by other sources. *Id.* ¶ 65.

The SAC alleges that the course of conduct outlined above has enabled the existence and perpetuation of an Enterprise that has coerced public assistance benefits from Plaintiff and the class members for substandard services — reflecting continuity, relationship, and a common goal — and constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

Id. ¶ 68. It further alleges that King and Tortora, who have either been employed or associated with the Enterprise, have conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through this pattern of racketeering activity, in violation of § 1962(c). *Id.* ¶ 69.

Regarding these RICO claims, Defendants King and SGM contend that dismissal of the SAC is warranted due to (1) the absence of a causal nexus between Plaintiff's alleged injuries and the alleged illegal activity in Plaintiff's RICO Statement; (2) the failure to allege an injury for which recovery may be had under RICO and the resultant lack of standing to bring a RICO claim; (3) the failure to plead a pattern of racketeering that satisfies either open-ended or close-ended continuity tests; (4) the failure to plead any set of facts showing that Defendants acquired or maintained an interest in a legitimate business through their racketeering activities; and (5) the failure to allege the existence of an enterprise for the purposes of 18 USC § 1962(c). ECF No. 424. In his motion to dismiss the SAC, State Defendant Tortora has expressly adopted these arguments. ECF No. 426-1. Plaintiff argues against dismissal on the ground that the SAC has sufficiently pled each of these elements.

Because I find that Plaintiff has failed to establish a causal nexus between his alleged injuries and the alleged racketeering activities, there is no need to address Defendants' remaining contentions.

To establish a nexus between his alleged injuries and the alleged racketeering activities, Plaintiff must allege sufficient facts to show that the predicate offense, "not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992). Thus, consistent with *Holmes*, sufficient facts must be alleged to show a "direct relationship" between the injury asserted and the RICO violation. *Id.* at 271 ("Proximate cause for RICO purposes ... requires 'some direct relation between the

injury asserted and the injurious conduct alleged… A link that is 'too remote,' 'purely contingent' or 'indirect[]' is insufficient.). The *Holmes* standard of causation was reiterated by the Supreme Court in *Hemi Group, LLC v. City of New York, NY*, 559 U.S. 1, 9 (2010).

Plaintiff has offered the decisions in *Ifill v. West*, No. 96 CV 6308(SJ), 1999 WL 690144, at *6 (E.D.N.Y. Aug. 24, 1999) and *Trautz v. Weisman*, 819 F. Supp. 282 (S.D.N.Y. 1993) as examples of RICO cases where courts determined that plaintiffs met their burden of pleading injuries proximately caused by the alleged acts of fraud directed at third parties where the fraud constituted a substantial factor in the sequence of responsible causation and either was reasonably foreseeable or anticipated as a natural consequence. These cases are inapposite. Foreseeability is not the relevant focus in the RICO context. *Hemi*, 559 U.S. at 12 ("The concepts of direct relationship and foreseeability are of course two of the "many shapes [proximate cause] took at common law," *Holmes, supra,* at 268, 112 S.Ct. 1311. Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm. Indeed, *Anza* and *Holmes* never even mention the concept of foreseeability.").

I agree with Defendants that a "direct relationship" between the alleged receipt of substandard services at Grace House and payment of public assistance benefits and any of the types of alleged mail fraud or other alleged illegal activities, ostensibly directed at the State of New York, is lacking. It cannot arguably be said that the SAC sets forth any facts to support an allegation that Plaintiff was the target of the mail fraud.

As Plaintiff has acknowledged, *Holmes* articulated a standing requirement for RICO plaintiffs. ECF No. 448. Therefore, I find that Plaintiff lacks standing to bring these civil RICO claims. These claims must be dismissed.

### D.  Motions to Dismiss the SAC's Constitutional Claims

Under 42 U.S.C. § 1983, civil liability is imposed upon any person who, under color of state law, subjects an individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States.  *See* 42 U.S.C. § 1983; *Wimmer v. Suffolk County Police Dept.*, 176 F.3d 125, 137 (2d Cir. 1999).  The statute states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ….

Section 1983, by its terms, is not "a source of substantive rights, but merely provides 'a method for vindication of federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  Here, Plaintiff has alleged violations of his constitutional rights under the First, Eighth and Fourteenth Amendments of the United States Constitution.

### 1.  King and SGM

Regarding Plaintiff's constitutional claims asserting violations of the Establishment Clause of the First Amendment, the Eighth Amendment, and the Due Process Clause of the Fourteenth Amendment, Defendants advance several arguments.  They argue that neither King nor SGM is a government actor, which is a requirement for Plaintiff's § 1983 action and, therefore, they are not liable under the First, Eighth, and Fourteenth Amendments; that issue preclusion directs dismissal, as well; and that a plain reading of the Establishment Clause, the Eighth Amendment, and the Due Process Clause reveals that none of these can be violated by private actors.

### a.  King and SGM as State/Government Actors Under 42 U.S.C. § 1983

To state a cognizable claim under § 1983, a plaintiff must establish a deprivation of his or her constitutional or statutory rights by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988).  Thus, in addition to showing that the challenged conduct took place "under color of state law," a plaintiff must identify a constitutionally protected liberty or property interest of which he was deprived without due process. *Colabella v. American Institute of Certified Public Accountants*, No. 10-CV-2291 (KAM) (ALC), 2011 WL 4532132, at *9 (E.D.N.Y. Sept. 28, 2011).

In order to act under color of state law, a person must have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of the state." *West v. Atkins*, 487 U.S. at 49.  "[I]f a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, 'that conduct [is] also action under the color of state law and will support a suit under § 1983.'" *Id.* (citing *Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 935 (1982)).  Thus, the conduct allegedly causing the deprivation of a federal right must be "fairly attributable to the State." *Lugar*, 457 U.S. at 937.

As both Plaintiff and Defendants apparently agree, a nominally private entity can be considered a state actor and held liable under § 1983 based on the theory that the private entity's actions were fairly attributable to the state where plaintiff alleges facts to satisfy either the: (1) "compulsion test": "the entity acts pursuant to the coercive power of the state or is controlled by the state"; (2) joint action test or close nexus test: "the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies"; or (3) "public function test": "the entity has been delegated a public function by the state." *Hollander v. Copacabana Nightclub*, 624 F.3d 30, 34 (2d Cir. 2010) (quoting *Sybalski v. Indep. Group Home Living Program, Inc.*, 546 F.3d 255, 257

(2d Cir. 2008)) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001)).  It is not enough to show that a plaintiff has pleaded "state involvement in '*some activity of the institution alleged to have inflicted injury upon a plaintiff*'; rather, the plaintiff must allege that the state was involved '*with the activity that caused the injury*'" which gave rise to the action. *Sybalski v. Indep. Group Home Living Program*, 546 F.3d at 257-58 (citing *Schlein v. Milford Hosp., Inc.*, 561 F.2d 427, 428 (2d Cir. 1977)).

Plaintiff asserts that he has sufficiently alleged that King and SGM are state actors under each of the three possible avenues.  As "facts" applicable to King and SGM, the SAC alleges:

> 25.     In the meantime, on September 9, 2005, under the threat of not being released from prison, Plaintiff signed the Conditions of Release demanded by the DOP and was transported by the DOP to "Grace House," a halfway house owned and operated by Defendant SGM and located at 1932 Bailey Avenue, Buffalo, New York 14211.  Under threat of parole revocation, Plaintiff to sign an "Inmate/Parolee Contract" with Defendant SGM.

> 26.     The Executive Director of Defendant SGM, Defendant King, is a convicted felon who has acknowledged past ties to organized crime.  In 1999, Defendant King was found liable in connection with an extensive scheme to defraud investors, a number of whom were elderly.  Defendant King was himself a parolee when he and others established Defendant SGM that same year.  Upon information and belief, Defendant Russi and others associated with DOP assisted in establishing Defendant SGM.

> 27.     Upon Plaintiff's arrival at Grace House, Defendant King told Plaintiff (a) that Defendant King's word held the same authority as that of a DOP parole officer, (b) that Plaintiff's participation in Christian Evangelical activities and programs while at Grace House was mandatory, and (c) that Plaintiff would be reported to the DOP for parole violation if he refused to participate in such activities and programs. A copy of the manual for one such program, the "S.T.A.R.T. Program," is attached hereto as **Exhibit B**. As a consequence of such threats and coercion, from the period of September 9, 2005, until August 7, 2006, Plaintiff participated in Evangelical Christian activities while residing at Grace House.

28.     During the period of his residence at Grace House, Plaintiff received counseling at the Buffalo Psychiatric Center's Butler Clinic.  Defendant SGM, however, is not a licensed health care provider and its "caretaker" employees, who control and supervise Grace House residents on a daily basis, are not qualified or trained to address mental health needs of those residents.     Upon information and belief, a number of the individuals employed as "caretakers" by Defendant SGM during Plaintiff's stay at Grace House were convicted felons and/or suffered from mental illness themselves.     Upon information and belief, such "caretakers" permitted and in some instances participated in theft and other illegal activities on the Grace House premises.  As a result of this living environment, which posed serious threat to Plaintiff's health and safety, Plaintiff's mental health issues were exacerbated.

29.     On August 7, 2006, Plaintiff was arrested by Defendant Russi and charged with parole violations, including charges that he threatened to kill one of the Grace House caretakers and inflict physical harm on other Grace House employees. Plaintiff's parole was subsequently revoked and he currently remains incarcerated.

31.     In connection with the events alleged herein, Defendants have at all times acted under color of state law and in concert. Defendant SGM holds itself out as being party to a "unique partnership" with DOP and DOP has dedicated office space on Defendant SGM's premises.     Pursuant to an express written agreement between Defendant SGM and DOP, parolees housed at SGM residences remain under the jurisdiction of the DOP and all program rules are subject to DOP's approval.  A copy of a "Scope of Services" portion of one of the contracts between Defendant SGM and DOP is attached hereto as **Exhibit C**.

32.     Defendants had direct and actual knowledge of the activities and conditions at Grace House, the backgrounds of SGM's employees and their deficient qualifications, and Plaintiff's mental health history.  In connection with the events alleged herein, including the placement of Plaintiff in Buffalo, New York with SGM, Defendants affirmatively fostered, or knew of and intentionally disregarded, an excessive and substantial risk to [Plaintiff's] mental health and acted with deliberate indifference to Plaintiff's mental health needs.

Assuming the truth of the Plaintiff's "fact" allegations, excepting those conclusory statements, this cause of action fails all three tests.  Analysis of these allegations gives way to support Defendants' arguments regarding them as private actors.

Turning first to the state compulsion test, a plaintiff must allege that the entity acts pursuant to the coercive power of the state or is controlled by the state. "A State normally can be held responsible for a private decision only when it has exercised coercive power or provided such significant encouragement, overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982). Here, favorably reading the SAC, there are no allegations which admit of any actual coercive or controlling acts of DOP regarding King, or the operations of SGM, or Grace House. *See Doe v. Harrison*, 254 F. Supp. 2d 338, 343 (2d Cir. 2003). The state compulsion test is not satisfied.

The joint action/close nexus inquiry is whether there is a "sufficiently close nexus between the State and the challenged action of the [private] entity so that the action of the latter may be fairly treated as that of the state itself." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974). Plaintiff argues that the SAC alleges Defendants King and SGM "performed many of their functions in conjunction with the State and therefore are joint actors," and cites two examples as support: DOP determines which parolees are required to reside in SGM's halfway houses; and SGM's employees enforce parole conditions established by the DOP and regularly report to the DOP on its residents' compliance with these provisions. ECF No. 414, ¶¶ 25, 27, 29. What's more, the SAC also alleges that he was told by King that he would be reported to the DOP for a parole violation for failure to participate in SGM program activities, that he was arrested by Russi who charged him with parole violations, including for threats to kill an SGM caretaker and to physically harm other SGM employees, and that his parole was subsequently revoked. ECF No. 414, ¶¶ 27, 29.

Taken together, these allegations are insufficient to convey the joint action required to convert King and SGM into state actors, since these allegations are little more than acknowledgments that DOP through Russi established the conditions of parole, and that it, not

either King or SGM, had the authority to violate Plaintiff's parole or return him to prison. Moreover, the lone allegation that "upon information and belief, Defendant Russi and others associated with DOP assisted in establishing Defendant SGM," if offered as an example of a close nexus, is both speculative and conclusory, and even if established, would be insufficient to show that King or SGM are state actors. The SAC lacks any factual allegations that the SGM was composed of and administered by Russi or any other DOP officials, and these officials directed the day-to-day workings of SGM. As such then, the allegations relied upon in this case do not remotely approximate the claim of state action cognized by the Supreme Court in *Brentwood* wherein it determined that the nominally private character of an interscholastic athletic association was "overborne by the pervasive entwinement of public institutions and public officials in its composition and workings." *Brentwood*, 531 U.S. at 298.

The facts that DOP contracts with SGM to provide transitional housing for parolees, and may rely substantially on government funds, are also insufficient for purposes of the close nexus/joint action test such that King and SGM are state actors. *Rendell-Baker v. Kohn*, 457 U.S. 830, 839 (1982) (private school's contracts with the State and receipt of substantial public funds did not support § 1983 action). That a private entity is regulated by the State is insufficient, by itself, to convert private action into state action for purposes of the Fourteenth Amendment, even if the "regulation is extensive and detailed." *Jackson*, 419 U.S. at 350. The requisite nexus is absent if the state merely acquiesces in or approves the actions of private parties. *Id.* Such is the situation here. The close nexus/joint action test has not been met.

Regarding the public function test, the Supreme Court has "found state action present in the exercise by a private entity of powers traditionally exclusively reserved to the State." *Jackson*, 419 U.S. at 352 (citations omitted). Plaintiff contends that housing prisoners is unquestionably a traditional state function. He draws an analogy between a halfway house and a

privately run prison—an entity which the Supreme Court suggested may be held liable under §
1983 in *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 71 n.5 (2001), and argues that a halfway
house, like a prison, houses and supervises on behalf of the state.  Liberally and favorably
reading the SAC, it clearly lacks any factual allegations that SGM was a privately run prison
housing prisoners as a power delegated to it by the state.

Moreover, the Court is not persuaded by the cases cited by Plaintiff as standing for the
proposition that halfway house employees may be held liable under §1983.  It is clear that none
of these cases are from any district court in New York State or from the Second Circuit.  As the
Defendants point out, courts in the Second Circuit, indeed, have consistently held that the
provision of transitional housing to former inmates under parole supervision is not a function
"traditionally the exclusive prerogative of the State." *See, e.g.*, *Byng v. Delta Recovery Servs.*,
No. 13-CV-733 (MD/ATB), 2013 U.S. Dist. Lexis 105606, at *24 (N.D.N.Y. Jul. 29, 2013);
*Moore v. Broady*, 10-CV-3250 (ENV), 2010 U.S. Dist. Lexis 79559, at *15 (E.D.N.Y. Aug. 6,
2010); *Phillips v. Goord*, 08-CV-0957 A(F), 2009 U.S. Dist. Lexis 29322, at *10-11 (W.D.N.Y.
Mar. 31, 2009); *Velez v. SES Operating Corp.*, 2008 U.S. Dist. Lexis 51257, at *4 (S.D.N.Y. Jul.
3, 2008). The public function test has not been satisfied.

Plaintiff also appears to advance a theory of conspiracy between King, SGM, and DOP
employees to commit a § 1983 violation against him.  It is accepted that for purposes of § 1983,
a private actor or entity may be considered to be acting under the color of state law if it was a
"willful participant in joint activity with the state." *Hollander*, 624 F.3d at 34; *Sybalski*, 546
F.3d at 257.  "This potential liability also applies to a private party who 'conspires with a state
official to violate the plaintiff's constitutional rights ....'" *Young v. Suffolk County*, 705 F. Supp.
2d 183, 195-96 (E.D.N.Y. 2010) (citing *Fisk v. Letterman*, 401 F. Supp. 2d 362, 378 (S.D.N.Y.
2005)).

> To demonstrate that a private party defendant was a state actor
> engaged in a conspiracy with other state actors under § 1983, a
> plaintiff must allege (1) an agreement between the private party
> and state actors, (2) concerted acts to inflict an unconstitutional
> injury, and (3) an overt act in furtherance of the goal. *See
> Carmody v. City of N.Y.,* No. 05–CV–8084 (HB), 2006 WL
> 1283125, at *5, 2006 U.S. Dist. LEXIS 25308, at *16 (S.D.N.Y.
> May 11, 2006) (citing *Ciambriello v. County of Nassau,* 292 F.3d
> 307, 324–25 (2d Cir. 2002)).  Vague and conclusory allegations
> that defendants have engaged in a conspiracy must be dismissed.
> *See Ciambriello,* 292 F.3d at 325 (dismissing conspiracy
> allegations where they were found "strictly conclusory"); *see also
> Robbins v. Cloutier,* 121 Fed.Appx. 423, 425 (2d Cir. 2005)
> (dismissing a § 1983 conspiracy claim as insufficient where
> plaintiff merely alleged that defendants "acted in a concerted
> effort" to agree not to hire plaintiff and to inform others not to hire
> plaintiff).  "A plaintiff is not required to list the place and date of
> defendants['] meetings and the summary of their conversations
> when he pleads conspiracy, but the pleadings must present facts
> tending to show agreement and concerted action."  (*Fisk v.
> Letterman,* 401 F.Supp.2d 362, 376 (S.D.N.Y. 2005) (report and
> recommendation), *adopted in relevant part by Fisk v. Letterman,*
> 401 F.Supp.2d 362 (S.D.N.Y. 2005)) (citations and quotations
> omitted).

*Id.* at 197.  Analysis of allegations of state action begins "by identifying the specific conduct of

which the plaintiff complains."  *Id.* (citing *Tancredi v. Metro. Life Ins. Co.,* 316 F.3d 308, 312

(2d Cir. 2003)) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 51, 119 S.Ct. 977, 143

L.Ed.2d 130 (1999)).  Although Plaintiff contends simply that the SAC "contains numerous

allegations that Defendants King and SGM conspired with State officials to deprive [him] and

similarly situated parolees of the constitutional rights," reviewing the SAC allegations favorably,

makes no references to any such conspiracy regarding his § 1983 claims.  While Plaintiff need

only allege a plausible claim that there was an agreement or joint action to inflict an

unconstitutional injury and an overt act in furtherance of the goal by Defendants, the SAC is

insufficient in this regard.  Even if the Court were to take Plaintiff's allegations that SGM

contracts with the DOP to provide transitional housing to parolees as the agreement, absent are

any allegations disclosing "concerted acts to inflict an unconstitutional injury," and an overt act

in furtherance of the goal. No § 1983 action lies against King and SGM on the ground of a conspiracy between to King, SGM, and DOP employees to commit a § 1983 violation against Plaintiff.

Defendants King and SGM contend that based on the Appellate Division, Fourth Department's decision in *Justice v. King*, 60 A.D.3d 1452 (N.Y. App. Div. 2009), issue preclusion prevents Plaintiff from arguing that King and SGM are state actors. ECF No. 424. In opposing this contention, Plaintiff argues that issue preclusion is inapplicable due to the lack of identity between the state actor issue raised in this case and the issue litigated and decided in the state appellate case. ECF No. 448.

Issue preclusion applies in circumstances when:

> (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was 'actually litigated and actually decided,' (3) there was 'a full and fair opportunity for litigation in the prior proceeding,' and (4) the issues previously litigated were 'necessary to support a valid and final judgment on the merits.'

*Ali v. Mukasey*, 529 F.3d 478, 489 (2d Cir. 2008) (quoting *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986)). For issue preclusion to apply, all four of these conditions must be met, even if the two suits are not based on the same cause of action. *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013). This doctrine prevents a party from engaging in "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001).

In reversing the lower court, the Fourth Department held that for purposes of the Freedom of Information Law ("FOIL"), N.Y. Public Officers Law § 86(3), SGM was not subject to FOIL requirements because it was not an "agency" which "means any state or municipal department, board, bureau, division, commission, committee, public authority, pubic corporation, council, office or other governmental entity performing a governmental proprietary function for

the state or any one or more municipalities thereof." *Id.* Further analyzing the status of SGM as a nongovernmental entity contracting with a governmental body on a fee for service basis, the state appellate court found:

> Here, it is undisputed that the DOP and other state agencies do not maintain any authority or control over SGM's budget, that SGM retains exclusive control over hiring and firing employees, and that SGM does not occupy public offices or space. Rather, SGM is an independent entity supported by private donations and formed for the purpose of promoting Christian principles to men recently released from incarceration.

*Id.* at 1453. Concluding that although SGM worked closely with DOP, existed solely to serve parolees, and performed DOP's functions and enforced DOP's rules, the Fourth Department ruled that SGM did so "as private contractor, not as an agent of the DOP or any other governmental entity." *Id.*

While I agree with Plaintiff that application of issue preclusion is inappropriate since in *Justice v. King* only the limited issue of whether or not SGM was an agency for FOIL purposes was litigated and decided by the state appellate court, not the broader, more complex issue of whether or not these Defendants are state actors for the purpose of stating a claim under § 1983, the state appellate court's reasoning, though not dispositive, serves to further magnify or correlate well with my earlier-stated conclusions in this regard.

Having analyzed the SAC's allegations under the relevant legal principles set forth above, I conclude that King and SGM are not state actors.

### b.  King and SGM's Motion to Dismiss Plaintiff's Constitutional Claims

The Court's determination that King and SGM are not state actors has implications for the causes of action of the SAC alleging against them violations of the Eighth Amendment, Due Process Clause of the Fourteenth Amendment, and the Establishment Clause of the First

Amendment.  Dismissal under the *Iqbal/Twombly* framework, is warranted as set forth herein
below.

As these Defendants have argued, each of these constitutional provisions is viewed from
the perspective of government actors.  First, the Eighth Amendment provides that "Excessive
bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments
inflicted."  U.S. Const. amend. VIII.  Relying on the Supreme Court's explicit ruling that "[b]ail,
fines, and punishment traditionally have been associated with the criminal process, and by
subjecting the three to parallel limitations the text of the Amendment suggests an intention to
limit the power of those entrusted with the criminal-law function of the government," *Browning-
Ferris Indus. of Vermont, Inc., v. Kelco Disposal, Inc.*, 492 U.S. 257, 263 (1989), King and SGM
argue that nothing in the SAC indicates that they were entrusted with the criminal-law function
of the government, and the mere contracting with the government to provide living space and
programs to parolees fails to suggest a violation of the Eighth Amendment protections.  I agree.

Second, the Fourteenth Amendment provides that "No State shall make or enforce any
law which shall abridge the privileges or immunities of citizens of the United States; nor shall
any State deprive any person of life, liberty, or property, without due process of law; nor deny to
any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.
I agree with Defendants that as private actors, King and SGM fall outside the ambit of the
Fourteenth Amendment.

Third, upon a cursory reading, the plain language of the First Amendment's
Establishment Clause provides that "Congress shall make no law respecting an establishment of
religion, or prohibiting the free exercise thereof," U.S. Const. amend. I, cl. 1.  While the SAC
makes no allegations remotely asserting any Congressional enactment either establishing a
religion or prohibiting the free exercise of religious beliefs or practices, it does allege that

Plaintiff was forced by King and SGM staff to participate in Christian Evangelical programming and activities at Grace House. Without question, "compliance with the Establishment Clause is a state interest," and the Establishment Clause forbids government speech endorsing religion. *See Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 761, 765 (1995) ("Where we have tested for endorsement of religion, the subject of the test was either expression *by the government itself* ... or else government action alleged to discriminate in favor of private religious expression or activity."). However, since neither King nor SGM has been determined to be a state actor, the Establishment Clause claim against them must be dismissed.

### 2. State Defendants Miraglia, Hogan, and Russi Motion to Dismiss Plaintiff's Constitutional Claims

Unlike King and SGM, considering the respective positions of employment of the State Defendants Miraglia, Hogan, and Russi in the OMH and the DOP during the relevant period outlined in the SAC, the assertions that they are state actors who were acting under the color of state law cannot reasonably be subject to dispute. *Lugar*, at 929 ("Similarly, it is clear that in a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical.").

#### a. Violation of the Fourteenth Amendment Asserted Against Defendants Miraglia and Hogan

The SAC alleges Plaintiff's belief that his prison sentences satisfied any and all statutory commitment requirements attendant to having been found not responsible by reason of mental disease or defect for the crimes relating to the deaths of his father and brother based upon the following: After the jury verdict in the retrial, but before sentencing on January 14, 1993, Plaintiff's attorney, John R. Nuchereno ("Nuchereno"), wrote to Miraglia in November 1992 inquiring about Plaintiff's mental hygiene status, and Miraglia responded in writing in December

1992 that, to his knowledge, no CPL § 330.20 applications had been initiated by OMH or were pending; additionally, in this letter Miraglia directed Nuchereno's attention to the February 20, 1987 sentencing, which he understood directed Plaintiff to be committed to OMH custody pursuant to New York State Corrections Law Article 16 "to satisfy the statutorily required commitments under counts 1, 3, 5, and 7," the counts "for which [Plaintiff] was found not responsible by reason of Mental Disease or Defect"; the Miraglia letter further stated that OMH records reflected that Plaintiff had received inpatient treatment pursuant to Correction Law § 402 at Central New York Psychiatric Center; and Miraglia communicated this information knowing that Nuchereno relied on Miraglia's representations in preparing the  presentence report.  ECF No. 414, ¶¶ 15-19.

The SAC further alleges that Plaintiff proceeded to serve his sentence, but was afforded no rights or procedural safeguards under CPL § 330.20, nor did Miraglia nor anyone else associated with OMH take action under CPL § 330.20 during the ensuing 12 plus years of service of his sentence; he was on out-patient status in prison for more than three years and could have received a discharge order pursuant to CPL § 330.20(13) had he been subject to processing under CPL § 330.20; and despite his written protests to OMH officials, and against the opinion of OMH psychiatric expert, Miraglia and other OMH representatives approved his release to Buffalo.  Plaintiff also alleges that the Order of Conditions granted by the Supreme Court, Erie County (Tills, J.) on January 3, 2006 was based upon "An application for Release Order Pursuant to [CPL §] 330.20" and "a proposed Order of Conditions."  ECF No. 414, ¶¶ 23-24.

Count I alleges that by subjecting him to CPL § 330.20, Defendants Miraglia and Hogan violated Plaintiff's rights under the procedural and substantive components of the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment because such action: constituted a deprivation of liberty without due process; is so egregious, outrageous and arbitrary

as to fairly shock the conscience and constitutes a gross abuse of governmental authority; and treated Plaintiff differently than other persons who have satisfied the statutory commitment requirements under CPL § 330.20, and this action results from intentional and purposeful discrimination against him. ECF No. 414, ¶¶ 34-36. He further alleges in this Count past and continued suffering, injury, and irreparable harm, and that the Order of Conditions is "unappealable and unreviewable" in state court. *Id.* ¶¶ 37, 38.

To establish a procedural due process claim, a plaintiff must show that he "possessed a protected liberty or property interest, and that he was deprived of that interest without due process." U.S. Const. amend XIV § 1. As these Defendants astutely point out, liberty interests are not created by the due process clause itself but may stem from an independent source such as state law. In this case the liberty interest deprivation of which Plaintiff complains flows from CPL § 330.20.

That Plaintiff *believed* that by serving his sentence he had satisfied his initial commitments is simply not enough to withstand the motion to dismiss. Accepting as true Plaintiff's allegation that CPL § 330.20 outlines a number of procedural safeguards which he was not afforded during the more than 12 years served of the sentences imposed following the retrial, there are no allegations evincing that Plaintiff was not afforded procedural due process regarding the initial commitment Order or in connection with the Order of Conditions granted by the Supreme Court, Erie County (Tills, J.) in 2006. Moreover, by his own admission, Plaintiff's return to prison was occasioned not by the application of CPL § 330.20, but by the revocation of parole release based upon a charged violation of his parole conditions due to threats to kill one of the Grace House caretakers and to inflict physical injury on other Grace House employees. ECF No. 414, ¶ 29.

Nor has Plaintiff alleged any facts to support his claim that the application of CPL § 330.20 was "so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Anthony v. City of New York*, 339 F.3d 129, 143 (2d Cir. 2003).

*Pro bono* counsel did not elucidate or address the SAC's allegations that Plaintiff's rights to equal protection were violated by the application of CPL § 330.20 due to being treated differently from other persons who have satisfied their statutory commitments under CPL § 330.20, and being intentionally discriminated against. Without question, the Equal Protection Clause of the Fourteenth Amendment provides that "No State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

Plaintiff's allegations regarding disparate treatment are not only conclusory and unsupported by facts showing how this treatment differed from similarly-situated persons, but he has not alleged "that the alleged discrimination is based upon a constitutionally impermissible basis, such as race, religion, national origin, or some other protected right." *Nash v. McGinnis*, 585 F. Supp. 2d 455, 462 (2008). The SAC fails to allege a facially valid equal protection claim.

### b.  Violation of First and Fourteenth Amendments by Russi

The SAC alleges that Russi[9] violated Plaintiff's First and Fourteenth Amendment rights. It alleges that SGM contracts with DOP to provide transitional residences and programs upon release from prison to parole supervision to those determined by DOP to be in need of such services; and as part of an ongoing custom, practice, and policy, coercion, including, the threat of parole revocation and/or refusal of parole release from prison, to accept placement at SGM residences, as well as to participate in Evangelical Christian activities, such as the S.T.A.R.T. Program and others at the halfway house and off-site.  ECF No. 414, ¶ 44.  In this way,

---

[9] King and SGM have been determined herein not to be state actors.

according to Plaintiff, his rights under the Establishment Clause of the First Amendment and the Due Process Clause of the Fourteenth Amendment have been violated, causing injury and irreparable harm. *Id.* ¶ 45.

Plaintiff's *pro bono* counsel did not address the alleged Establishment Clause and Due Process violations in the legal memorandum submitted on Plaintiff's behalf. Russi argues that the SAC fails to allege his personal involvement and direct participation in any of the conduct alleged to have violated Plaintiff's constitutional rights. ECF No. 426-1.

Personal involvement is a prerequisite for the assessment of damages in a § 1983 action against a supervisory official sued in his individual capacity. *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010); *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001). Personal involvement of a supervisory defendant may be demonstrated by evidence that the defendant: (1) directly participated in the alleged violation; (2) failed to remedy the wrong after being informed of the violation through a report or an appeal; (3) created a policy or custom under which unconstitutional practices occurred or were permitted to continue; (4) was grossly negligent in supervising the subordinates who committed wrongful acts; or (5) exhibited deliberate indifference to inmates' rights by failing to act on information indicating that unconstitutional acts were occurring.[10] *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *see Williams v. Smith*, 781 F.2d 319, 323-324 (2d Cir. 1986). Under the *Colon* analysis, "The mere fact of supervisory authority, however, is insufficient to demonstrate liability, based on a failure to supervise, under § 1983." *Id.* at 874; *Ramsey v. Goord*, 661 F. Supp. 2d 370, 385 (2009).

---

[10] *Grullon v. City of New Haven*, 720 F.3d 133 (2d Cir. 2013), cited all five factors set out in *Colon v. Coughlin*, and further, referenced the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), indicating that *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain violations." The Second Circuit has yet to rule on *Iqbal's* significance. *See Liner v. Fischer*, 2013 WL 3168660, *7+ (S.D.N.Y. June 24, 2013) (summarizing the state of the law in this Circuit regarding how many of the *Colon* factors survive in the wake of *Iqbal*, and agreeing with the "majority view" that where the constitutional claim does not require a showing of discriminatory intent, the personal-involvement analysis in *Colon* should still apply); *see also Wik v. Kunego*, 2012 WL 4801038, at *3, n.3 (W.D.N.Y. 2012); *Stresing v. Agostinoni*, 2012 WL 2405240, at *4 (W.D.N.Y. 2012).

Here, the SAC fails to allege any facts supporting the application of any of the *Colon* factors to Russi. In the absence of any factual allegations supporting Russi's personal involvement in any of the alleged constitutional deprivations, the § 1983 action against him regarding these claims must be dismissed.

### c. Violation of the Eighth Amendment and Fourteenth Deliberate Indifference

In Count III, Plaintiff alleges violations of the Eighth and Fourteenth Amendments due to injury and irreparable harm stemming from "the foregoing objective conditions and deliberate indifference to Plaintiff's mental health needs." The SAC alleges that the described conditions at Grace House "exacerbated his mental health condition." The state Defendants argue that the SAC fails to adequately allege any constitutional violation on the ground of deliberate indifference.

The Eighth Amendment, made applicable to the states by the Fourteenth Amendment, explicitly prohibits the infliction of "cruel and unusual punishments." U.S. Const. amends. VIII, XIV. In *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), the Supreme Court established "the government's obligation to provide medical care for those whom it is punishing by incarceration" and concluded that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). The *Estelle* Court determined the duty of the government to provide for the serious medical needs of inmates who must rely on prison authorities to treat their medical needs, unequivocally declaring that the Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity and decency," therefore, "punishments which are incompatible with the evolving standards of

decency that mark the progress of a maturing society," are repugnant to these concepts.  *Id.* at 103 (internal quotation marks and citations omitted).

The deliberate indifference standard includes both objective and subjective components. Objectively, the deprivation must be "sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v, Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  Deliberate indifference also requires a showing that the official was subjectively aware of substantial risk of serious harm to an inmate.  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (No liability under the Eighth Amendment based on the denial of humane conditions of confinement "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").  *Id.* at 837.   Deliberate indifference is the equivalent of criminal recklessness.  *Id.* No claim of deliberate indifference under the Eighth Amendment is stated by allegations amounting to mere negligence.  *Estelle*, 429 U.S. at 106.  "[M]ere disagreement over the proper treatment does not create a constitutional claim."  *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).  "The essential test is one of medical necessity and not one simply of desirability." *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).

*Estelle*'s deliberate indifference standard equally applies to the constitutional adequacy of medical care for physical ills and psychological or psychiatric care.  Thus, "[t]reatment of mental disorders of mentally disturbed inmates is a serious medical need."  *Williams v. New York*, No. 13-CV-0003Sc., 2015 WL 249275, at *2 (W.D.N.Y. Jan. 15, 2015).

As the SAC alleges, Plaintiff's claim of deliberate indifference to his mental health needs arose not when he was an inmate, but during his status as a parolee, and he has affirmatively stated that Count III does not involve prison conditions.  If the Court were to literally interpret

*Estelle* as applying only to incarcerated prisoners, clearly, the SAC would fail to state a claim under the Eighth Amendment's prohibition against cruel and unusual punishment based on Plaintiff's status as a parolee during the time the conduct complained of occurred and his affirmative assertion that this cause of action does not concern prison conditions (ECF No. 414, ¶ 50). In this regard, one court observed that the *Estelle* Court had no occasion to discuss the responsibility of the government to those not in its custody. *McGhie v. Main*, No. 11-CV-3110 (NGG)(JO), 2011 WL 4852268, at *3 (E.D.N.Y. Oct. 12, 2011) (parolee's Eighth Amendment claim dismissed by district court because there was no deliberate indifference to serious medical needs where mental health treatment previously provided through Probation Department abruptly stopped; he was free to find treatment on his own).

The government's obligation to provide medical services to prisoners pursuant to *Estelle*, "is an exception to the general rule that the Due Process Clause does not generally place affirmative duties on the state." *Lugo v. Senkowski*, 114 F. Supp. 2d 111, 115 (N.D.N.Y. 2000); (citing *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 198 (1989)) ("It is true that in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals. In *Estelle* … we recognized that the Eighth Amendment's prohibition against cruel and unusual punishment, made applicable to the States through the Fourteenth Amendment's Due Process Clause … requires the State to provide adequate medical care to incarcerated prisoners.") (internal citations omitted).

While, nowhere in the SAC is it alleged that these state Defendants had an Eighth Amendment duty to provide Plaintiff with mental health care while he was on parole, he argues that as determined by one court, there may be a limited right to mental health treatment of a parolee, at least in the immediate period of transitioning from prison. *Lugo v. Senkowski*, 114 F. Supp. 2d at 115 ("The State has a duty to provide medical services for an outgoing prisoner who

is receiving continuing treatment at the time of his release for the period of time reasonably necessary for him to obtain treatment 'on his own behalf.'").

Assuming the applicability of Eighth Amendment principles, even if these Defendants were aware of some risk of stress to Plaintiff by releasing him to the Buffalo area, the SAC alleges no facts from which it can be said that Defendants disregarded an excessive risk to Plaintiff's health or safety.   The SAC alleges forthrightly that "[d]uring the period of his residence at Grace House, Plaintiff received counseling at the Buffalo Psychiatric Center's Butler Clinic" (ECF No. 414, ¶ 28), and Plaintiff makes no claims regarding the quality or inadequacy of the mental health services provided by Buffalo Psychiatric Center's Butler Clinic, which the state Defendants have maintained is a facility operated by OMH under New York Mental Hygiene Law § 7.17(b).  The SAC fails to allege a violation of the Eighth Amendment or Fourteenth Amendment due to the denial of adequate mental health treatment by Miraglia, Hogan, and Russi (ECF No. 414, ¶¶ 28, 32, 48-50).

The Second Circuit, recognizing that "a parolee, although not in the state's physical custody is nonetheless in its legal custody, and his or her freedom of movement, while not as restricted as that of an incarcerated prisoner, is nonetheless somewhat curtailed," but because the limitations imposed by the state are minimal, so too are the state's duties. *Jacobs v. Ramirez*, 400 F.3d 105, 106 (2d Cir. 2005).  The Defendants satisfied this limited duty by providing counseling to Plaintiff at the Buffalo Psychiatric Center's Butler Clinic.

In a different aspect, the SAC further alleges that Plaintiff was compelled to reside at Grace House in a living environment which Defendants knew posed a serious threat to his health and safety under conditions whereby his "mental health issues were exacerbated." ECF No. 414, ¶ 28.  The SAC fails to specify the nature of these mental health issues, and Plaintiff's argument that he suffered from a dangerous mental disease is seriously contradicted by the Order of

Conditions, which could only be obtained upon a court determination that he no longer suffered from dangerous mental disorder and is not mentally ill. CPL § 330.20(12).

Contrary to *pro bono* counsel's assertions, no factual allegations support that some entity other than the Buffalo Psychiatric Center's Butler Clinic was responsible for providing counseling to Plaintiff. Indeed, even accepting as true, allegations: that King was a convicted felon; Grace House was not a licensed health care provider and its caretaker employees not trained or qualified to address mental health needs of the residents; upon information and belief, a number of the individuals employed as "caretakers" by Defendant SGM during Plaintiff's stay at Grace House were convicted felons and/or suffered from mental illness themselves; and upon information and belief, such "caretakers" permitted and in some instances participated in theft and other illegal activities on the Grace House premises, the SAC fails to state a claim for deliberate indifference.

First, the SAC fails to show how merely residing at Grace House with other convicted felons, Plaintiff, also a convicted felon, was subjected to a substantial risk contemplated by the Eighth Amendment. Second, and more importantly, there are no factual allegations from which to surmise that despite not being a licensed health care provider or having caretaker employees who were untrained and unqualified to address mental health needs, Grace House staff provided or attempted to provide mental health treatment to Plaintiff, and the Defendants were aware of and disregarded a serious risk to Plaintiff's mental health posed thereby. The deliberate indifference claim must be dismissed.

## IV.   CONCLUSION

Plaintiff's motions for a TRO (ECF No. 440), class certification (ECF No. 41), and sanctions and preclusion (ECF No. 431) are hereby DENIED, with prejudice. Defendants'

motions to dismiss for failure to state a claim (Fed. R. Civ. P. 12(b)(6)) (ECF No. 418) and (ECF No. 426) are hereby GRANTED.  The Court hereby Orders that the Second Amended Complaint (ECF No. 414) is dismissed, with prejudice.  The Clerk of the Court is directed to terminate Defendants Ken Wilson, Charles Sears, KC Sharma, Brenda Martin, Dr. Arvind Samant, Kim Karalus, and Dr. Jeffrey Grace, as parties to this action.  The Clerk of the Court is also directed to add Michael Hogan as a party to this action.  Further, the Clerk of the Court is directed to close this case, Civil Action No. 08-CV-6417.

IT IS SO ORDERED.

Dated: March 27, 2015
       Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court

45